UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
CRUCIBLE MATERIALS CORPORATION,

                                        Plaintiff,


        -v-                                                      5:97-CV-759


CERTAIN UNDERWRITERS AT LLOYD'S
LONDON & LONDON MARKET COMPANIES,


                                        Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                            OF COUNSEL:

HANCOCK & EASTABROOK LLP                ALAN J. PIERCE, ESQ.
Attorneys for Plaintiff
1500 AXA Tower I
Syracuse, New York 13221-4976

K & L GATES LLP                         THOMAS E. BIRSIC, ESQ.
Attorneys for Plaintiff
535 Smithfield Street
Henry W. Oliver Building
Pittsburgh, Pennsylvania 15222-2312

BAACH, ROBINSON & LEWIS PLLC            BRUCE R. GRACE, ESQ.
Attorneys for Defendants
1201 F Street, NW
Suite 500
Washington, D.C. 20004

SUGARMAN LAW FIRM LLP                   TIMOTHY PERRY, ESQ.
Attorneys for Defendant London Market
Companies
211 West Jefferson Street
Syracuse, New York 13202

DAVID N. HURD
United States District Judge

**MEMORANDUM-DECISION & ORDER**

**I. INTRODUCTION**

More than twelve years ago, plaintiff Crucible Materials Corporation ("plaintiff" or "Crucible") filed suit for, *inter alia*, the alleged breach of an excess liability insurance contract issued in 1968 ("the 1968 policy").  Plaintiff's complaint also included a claim for declaratory relief pursuant to 28 U.S.C. § 2201 declaring the parties' rights and obligations under the 1968 policy.  Following four written district court opinions and an appellate decision from the Second Circuit, see Crucible Materials Corp. v. Aetna Cas. & Sur. Co., No. 5:97-CV-759, 2007 WL 1827473 (N.D.N.Y. June 22, 2007), vacated sub nom., Crucible Materials Corp. v. Certain Underwriters at Lloyd's London, 330 F. App'x 223 (2d Cir. 2009);[1] Crucible Materials Corp. v. Aetna Cas. & Sur. Co., 228 F. Supp. 2d 182 (N.D.N.Y. 2001) (Munson, Senior J.); Crucible Materials Corp. v. Aetna Cas. & Sur. Co., No. 5:97-CV-759, 2000 WL 748104 (N.D.N.Y. June 5, 2000) (Munson, Senior J.); Crucible Materials Corp. v. Aetna Cas. & Sur. Co., No. 97-CV-759, 1998 WL 404239 (N.D.N.Y. July 15, 1998) (Munson, Senior J.), the only remaining defendants are Certain Underwriters at Lloyd's London and London Market Companies ("defendants" or "London").[2]

Defendants move for summary judgment pursuant to Federal Rule of Civil Procedure 56.  Plaintiff opposes.  Defendants' motion was considered without oral argument.

---

[1] Pursuant to Second Circuit Local Rule 32.1(b), the summary order issued by the Court of Appeals is hereinafter cited only for its facts and not its precedential value.

[2] Defendants are also sometimes referred to as "Underwriters" in various exhibits filed in support of the parties' arguments.

## II. **BACKGROUND**

The parties are presumed to be familiar with the facts underlying plaintiff's claims in light of the number of written opinions already issued.  Nevertheless, a brief recitation of the procedural history is helpful for identifying the legal issues relevant to defendants' present motion.

Plaintiff's claims center around two different types of insurance coverage issued by its insurance carriers: (1) primary liability insurance and (2) excess liability insurance.  (See Pl'.s Third Am. Compl., Dkt. No. 104, ¶ 11.)  Primary liability insurance protects the insured against a specified level of future losses, whereas excess liability insurance protects the insured from losses beyond the underlying insurance level.  Here, plaintiff obtained primary liability insurance, first-layer excess liability insurance, and second-layer excess liability insurance.  In 2001, the judge to whom this case was previously assigned granted summary judgment in favor of plaintiff's primary liability and first-layer excess liability insurance provider–then-defendant Travelers Casualty and Surety Company[3] (hereinafter "Travelers")–as a result of plaintiff's failure to provide reasonable notice of its insurance claim.  Crucible Materials Corp., 228 F. Supp. 2d at 198.  The remaining parties were asked to submit additional briefing on the limited issue of whether the second-layer excess liability insurance providers, including the present defendants, could be held liable notwithstanding the decision to dismiss all claims against the primary liability insurance provider.  Id. at 200. As Senior District Judge Munson explained: "Rather than resolve this issue *sua sponte*, the court seeks additional briefing from the parties that specifically addresses whether Crucible is

_____

[3] Formerly known as Aetna Casualty and Insurance Company.

entitled to excess coverage where all claims against the general liability carrier have been dismissed." Id.

In response to the court's request, the parties simultaneously filed supplemental briefs on July 20, 2001.  (See Defs.' Supplemental Trial Br., Dkt. No. 179 (hereinafter "Defs.' Supplemental Br."); Pl.'s Mem. Regarding Trigger of the Excess Liability Policies., Dkt. No. 184 (hereinafter "Pl.'s Supplemental Br.")) At that time, the parties agreed that the relevant issue was whether Travelers's successful late notice defense precluded defendants from being held liable for breach of the 1968 policy.  (See Defs.' Supplemental Br. at 2; Pl.'s Supplemental Br. at 6.)

In support of their position, defendants explained that "[q]uestions of coverage will generally depend upon the terms and conditions of the insurance policy."  (Defs.' Supplemental Br. at 2).  As a preliminary matter, defendants argued that plaintiff could not prove the terms and conditions of the 1968 policy because none of the parties were in possession of a copy of the policy agreement.  (Id.)  Alternatively, even under plaintiff's purported terms and conditions of the 1968 policy, defendants contended that excess liability coverage applied only in the event the primary liability insurance providers "paid or have been held liable to pay the full amount of their respective ultimate net liability . . . ."  (Id. at 3-4 (quoting Ex. 2 to Defs.' Supplemental Br., Dkt. No. 179, 12.))  In light of the dismissal of the claims against plaintiff's primary and first-layer excess liability insurance provider, defendants argued their obligations, if any, to plaintiff under the 1968 policy never matured because Travelers neither paid nor was held liable to pay the full amount of its respective net liability due to its successful late notice defense.

In contrast, plaintiff argued it was entitled to second-layer excess liability coverage despite the dismissal of its claims against its primary and first-layer excess liability insurance provider so long as it "establishes at trial that it has satisfied the terms of coverage set forth in the excess policies." (Pl's. Supplemental Br. at 6.)  Although plaintiff conceded that it no longer possessed a copy of the 1968 policy, it argued that the policy's terms and conditions were nonetheless capable of being proven because the policy incorporated by reference the terms and conditions set forth in § 2.2 of Travelers's first-layer excess indemnity policy. (Id.) Pursuant to § 2.2 of that policy, "*[t]he limits of liability of any underlying insurance policy shall be deemed applicable irrespective of (1) any defense which the underlying insurer may assert because of the Insured's failure to comply with any condition of the policy subsequent to an occurrence*, or (2) the inability of the underlying insurer to pay by reason of bankruptcy or insolvency." (Id. (emphasis in original))  Based upon its position that the 1968 policy incorporated this language by reference, plaintiff asserted there was a triable issue of fact as to whether the 1968 policy provided insurance coverage for excess liabilities notwithstanding Travelers's successful late notice defense. (Id. at 7.)

In light of the simultaneous filing of the parties' supplemental briefs on July 20, 2001, none of the parties were apprised of the opposing arguments prior to filing their memorandums of law.  In particular, defendants were unaware that plaintiff intended to rely upon the position that the 1968 policy incorporated by reference the terms of Travelers's first-layer excess liability policy. (See Defs.' Mot. for Leave to File Mem. of Law in Opp'n, Dkt. No. 231-1, 2.)  As a result, plaintiff and defendants filed response briefs to each other's supplemental briefs on September 12, 2001. (See Pl.'s Resp. Mem. of Law, Dkt. No. 189;

Defs.' Resp. Mem. of Law, Dkt. No. 231-2.[4])  Both response briefs addressed, *inter alia*, the

incorporation by reference issue.  For example, plaintiff's response brief reiterated the same

position expressed in plaintiff's supplemental brief, i.e., that § 2.2 of the Travelers first-layer

excess policy "is equally applicable to the excess liability policy Underwriters issued to

Crucible in 1968 because this language was incorporated by Underwriters into the 1968

policy."  (Pl.'s Resp. Mem. of Law, Dkt. No. 189, 2 (citing Pl.'s Supplemental Br. at 7 n.13.))

Defendants argued in their response brief that plaintiff failed to produce any evidence to

support its position that the 1968 policy incorporated by reference § 2.2 of the Travelers first-

layer excess policy.  (Defs.' Resp. Mem. of Law, Dkt. No. 231-2, 3-6.)  During a conference

on October 22, 2001, Judge Munson informed the parties that he would consider the excess

liability issue based upon their submissions and issue a written decision.  (See Minute Entry,

Dkt. No. 194.)

        Following a stipulated delay, the case was reassigned to the undersigned on

December 13, 2006. (See Order, Dkt. No. 213.)  At that time, four motions were pending: (1)

plaintiff's motion for reconsideration of the 2001 summary judgment decision in favor of

Travelers; (2) defendants' motion for summary judgment based upon the dismissal of all

claims against Travelers; (3) defendants' motion for reconsideration of the 2001 decision to

deny in part their motion for summary judgment; and (4) defendants' motion to strike one of

plaintiff's exhibits submitted in support of its motion for reconsideration.  Oral argument was

heard on May 30, 2007, in Utica, New York, and decision was reserved on all motions.

---

        [4] The docket number assigned to defendants' response memorandum is not sequentially numbered
due to a clerical error.

On June 22, 2007, defendants' motion for summary judgment based upon the dismissal of all claims against Travelers was granted and plaintiff's motion for reconsideration was denied.  Crucible Materials Corp., 2007 WL 1827473, at *2.  Prior to that decision, plaintiff conceded that its right to excess liability coverage given the dismissal of its primary insurance provider rested upon its contention that the 1968 policy incorporated by reference the terms and conditions of the Travelers first-layer excess policy.  (See Pl.'s Supplemental Br. at 6-7; Pl.'s Resp. Mem. of Law, Dkt. No. 189, 2.)  After determining that plaintiff could not produce any evidence showing that the 1968 policy incorporated by reference the terms of the Travelers first-layer excess liability policy, summary judgment was granted in favor of defendants, and their remaining motions were denied as moot.  Crucible Materials Corp., 2007 WL 1827473, at *1-2.

On July 19, 2007, plaintiff appealed the summary judgment decision in favor of defendants to the Second Circuit.  (Notice of Appeal, Dkt. No. 221.)  On May 14, 2009, the Second Circuit vacated and remanded the summary judgment decision on the basis that summary judgment was improperly granted sua sponte.  Crucible Materials Corp., 330 F. App'x at 225-26.  The Court of Appeals reasoned that "[p]rior to the District Court's June 22, 2007 decision and order, neither side briefed the issue of whether there existed a dispute as to the terms of the 1968 policy."  Id. at 226.  Having determined that plaintiff "was not afforded adequate notice that the District Court had under advisement the question of an asserted failure to prove the terms of the 1968 policy," the court reinstated plaintiff's claims against defendants.  Id.

## III.  DISCUSSION

In accordance with the mandate of the Second Circuit, defendants now move for summary judgment as to plaintiff's reinstated claims.  Defendants contend summary judgment is warranted on three separate grounds: first, that plaintiff is not entitled to excess liability coverage under the 1968 policy because there is insufficient evidence to support plaintiff's contention that the 1968 policy incorporated by reference § 2.2 of the Travelers policy; second, that plaintiff's losses do not meet the attachment point of the 1968 policy under either Pennsylvania or New York allocation law; and third, that, as a matter of law, plaintiff did not provide reasonable notice of its insurance claim for the Trent Tube site.

### A.  Summary Judgment Standard

Summary judgment is warranted when the pleadings, depositions, answers to interrogatories, admissions, and affidavits reveal no genuine issue as to any material fact. FED. R. CIV. P. 56; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986).  All facts, inferences, and ambiguities must be viewed in a light most favorable to the non-moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986); Mandell, 316 F.3d at 377.  Initially, the burden is on the moving party to demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2458 (1986).  After the moving party has satisfied its burden, the non-moving party must assert specific facts demonstrating there is a genuine issue to be decided at trial.  FED. R. CIV. P. 56(e)(2); Liberty Lobby, Inc., 450 U.S. at 250, 106 S. Ct. at 2511.  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co., 475 U.S. at 586, 106 S. Ct. at 1356.  There must be sufficient evidence upon which a reasonable

fact finder could return a verdict for the non-moving party.  Liberty Lobby, Inc., 477 U.S. at 248-49, 106 S. Ct. at 2510; Matsushita Elec. Indus. Co., 475 U.S. at 587, 106 S. Ct. at 1356.

### B.  The Prior Dismissal of Travelers – Incorporation by Reference

It remains defendants' position that there are no issues of fact that, even if construed in the light most favorable to plaintiff, would tend to prove that the 1968 policy incorporates by reference § 2.2 of the Travelers first-layer excess liability policy.  Defendants' argument follows that plaintiff is therefore not entitled to second-layer excess liability insurance coverage where all claims against the primary and first-layer excess liability insurance provider have been dismissed.

Although the parties previously dedicated much of their attention to plaintiff's incorporation by reference argument, that theory ignores the most important issue relevant to Judge Munson's request for additional briefing.  Under either Pennsylvania or New York law, an insurer's obligation pursuant to an excess liability insurance policy is triggered after protection under the underlying insurance policy is exhausted.  See, e.g., Int'l Bus. Machs. Corp. v. Liberty Mut. Fire Ins. Co., 303 F.3d 419, 429 (citing Gen. Accident Fire & Life Assurance Corp. v. Piazza, 4 N.Y.2d 659, 669, 176 N.Y.S.2d 976 (1958)); U.S. Fire Ins. Co. v. Am. Nat'l Fire Ins. Co., No. 3986 Feb. Term 2000, 040480, 040621, 2002 WL 1758336, at *7, (Pa. Com. Pl. July 8, 2002) (citing Occidental Fire and Cas. Co. of N. Carolina v. Brocious, 772 F.2d 47, 54 (3d Cir. 1985)).  Even if the claims against the primary liability insurance provider are settled or dismissed, the more pressing question concerning the enforcement of an excess liability insurance policy is whether the insured satisfied the terms and conditions of the agreement, including whether the losses incurred were in excess of the underlying policy limits.  See U.S. Fire Ins. Co., 2002 WL 1758336, at *7 (holding that the

excess liability policy was never triggered because the insured did not endure losses in excess of the primary liability policy limits); Westview Assocs. v. Guar. Nat'l Ins. Co., 95 N.Y.2d 334, 339-40, 715 N.Y.S.2d 75, 77-78 (2000) (enforcing an excess liability insurance policy despite successful policy-based defense asserted by primary insurance provider); see also Koppers Co. v. Aetna Cas. & Sur. Co., 98 F.3d 1440, 1454 (3d Cir. 1996) ("[I]f the underlying primary insurer is solvent but the policyholder settles its claim against that primary insurer for less than policy limits, we predict the Pennsylvania Supreme Court would adopt the widely-followed rule that the policyholder may recover on the excess policy for a proven loss to the extent it exceeds the primary policy's limits.") (citing Barry R. Ostranger & Thomas R. Newman, Handbook on Insurance Coverage Disputes § 13.04, at 575-77 (7th ed. 1994)).

To finally provide an answer to Judge Munson's question first posed to the parties in 2001, the plaintiff may seek indemnification under the terms of the 1968 policy despite the dismissal of its claims against Travelers so long as it can prove the terms and conditions of the insurance contract were fulfilled, including losses in excess of the underlying policy limits. The merits of plaintiff's incorporation by reference theory are therefore irrelevant, and defendant's motion for summary judgment on that basis will be denied.

### C. Plaintiff's Losses – Allocation

Defendant alternatively argues summary judgment is warranted because plaintiff's losses do not exceed the policy limits established under Travelers's primary and first-layer excess liability insurance policies. As a threshold matter, the parties dispute whether Pennsylvania or New York law applies when allocating plaintiff's losses amongst the various insurance policies that were issued. Accordingly, the choice of law issue must be decided

prior to consideration of whether plaintiff's losses reach the attachment point for the 1968 policy.

### 1.  Choice of Law

The choice of law issue was previously considered in 2000.  Crucible Materials Corp., 2000 WL 748104, at *5.  In order to decide that issue, Pennsylvania's conflict of law rules were applied because plaintiff's lawsuit was originally filed in Pennsylvania federal court prior to being transferred to this district.  See Van Dusen v. Barrack, 376 U.S. 612, 639, 84 S. Ct. 805, 820 (1964).  At the time of that decision, Pennsylvania precedent instructed courts to apply the law of the state where the insurance contract was delivered.  See Travelers Indem. Co. v. Fantozzi ex rel. Fantozzi, 825 F. Supp. 80, 84 (E.D. Pa. 1993) (citing Crawford v. Manhattan Life Ins. Co., 208 Pa. Super. 150, 154 (Pa. Super. Ct. 1966)).  Because there was no evidence as to where defendants' insurance policies were delivered, delivery was presumed to have been made at the residence of the insured.  See Travelers Indem. Co., 825 F. Supp. at 84 (citations omitted).  Therefore, in light of plaintiff's undisputed residence within Pennsylvania, the 1968 policy was deemed subject to Pennsylvania law.  Crucible Materials Corp., 2000 WL 748104, at *5.

Normally, prior decisions made within the same case must be followed under the law-of-the-case doctrine.  See Catanzano by Catanzano v. Wing, 103 F.3d 223, 231, n.5 (2d Cir. 1996); United States v. Salerno, 932 F.2d 117, 121 (2d Cir. 1991).  However, a prior decision may be reconsidered for a compelling reason, such as when there is "'an intervening change in controlling law, there is new evidence, or a need is shown to correct a clear error of law or to prevent manifest injustice.'"  Catanzano by Catanzano, 103 F.3d at 231, n.5 (quoting United States v. Sanchez, 35 F.3d 673, 677 (2d Cir. 1994)).

After the decision to apply Pennsylvania law in this case was issued in 2000, intermediate Pennsylvania courts considering choice of law issues began to place less emphasis on the state in which the contract was delivered and greater emphasis on a state's overall contacts with an insurance contract.  See Budtel Assocs., LP v. Cont'l Cas. Co., 915 A.2d 640, 643-44, 645, n.6 (Pa. Super. Ct. 2006) (collecting cases).  The rationale for this departure was that the old rule placed too much significance upon a single contact, whereas the new rule allowed courts to consider the totality of a state's contacts with a contractual relationship, including the state in which the contract was delivered.  Id. at 644-45.  In 2007, the Third Circuit Court of Appeals agreed with the ruling in Budtel and predicted that the Pennsylvania Supreme Court would consider a state's contacts with the contractual relationship instead of solely looking to the place of delivery when resolving conflicts of state law.  Hammersmith v. TIG Ins. Co., 480 F.3d 220, 228-29 (3d Cir. 2007) (holding that the "overwhelming weight of authority" rejects the place-of-delivery rule).  In light of these relatively recent legal developments which took place after the decision in 2000 to apply Pennsylvania law, the prior choice of law determination must be revisited.

The first step in the choice of law analysis is to determine whether there is an actual conflict between the state laws under consideration.  Id. at 230 (citing Air Prod. & Chems., Inc. v. Eaton Metal Prods. co., 272 F. Supp. 2d 482, 490 (E.D. Pa. 2003)).  An actual conflict will exist so long as there is a material difference between the laws of the two states.  Hammersmith, 480 F.3d at 230.  Second, if there is an actual conflict, "the court should examine the governmental policies underlying each law, and classify the conflict as a 'true,' 'false,' or an 'unprovided-for' situation."  Id.  A relevant difference between the laws of two states will be considered a true conflict "if *both* jurisdictions' interests would be impaired by

the application of the other's laws." Id. (emphasis in original) (citing Cipolla v. Shaposka, 439 Pa. 563, 566, 267 A.2d 854, 856 (1970)).  In the event there is a true conflict, the third step asks which state has "'the greater interest in the application of its law.'" Hammersmith, 480 F.3d at 231 (quoting Cipolla, 439 Pa. at 566, 267 A.2d at 856).  When making this determination, a state's contacts must be weighed "'on a qualitative scale according to their relation to the policies and interests underlying the [particular] issue.'" Hammersmith, 480 F.3d at 231 (alteration in original) (quoting Shields v. Consol. Rail Corp., 810 F.2d 397, 400 (3d. Cir. 1987)).  Where, as is the case here, the insured risk is located throughout a number of different states, the following contacts must be evaluated: "(1) the place of contracting; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, place of incorporation and place of business of the parties." Hammersmith, 480 F.3d at 233 (citing RESTATEMENT (SECOND) OF CONFLICTS OF LAWS § 188 (1971)).

### a. **Actual Conflict of Law**

New York allocates an insured's losses by distributing the highest projection of alleged damages evenly across the number of years for which insurance was obtained.  See Consol. Edison Co. of N.Y., Inc. v. Allstate Ins. Co., 98 N.Y.2d 208, 216, 225, 746 N.Y.S.2d 622, 624, 630 (2002).  Under this "time on the risk" method of allocation, the trial court in Consol. Edison dismissed several of the excess liability insurers from the lawsuit because their excess liability policies would not be reached even assuming the plaintiff was successful at trial. Id. at 216, 746 N.Y.S.2d at 624.  The New York Court of Appeals affirmed the trial court's decision, reasoning that "[p]ro-ration of liability among the insurers acknowledges the fact that there is uncertainty as to what actually transpired during any particular policy

period." Id. at 224, 746 N.Y.S.2d at 630.  Notably, plaintiff does not offer any argument in opposition to this interpretation of New York's law concerning the allocation of an insured's losses.  (See generally Pl.'s Mem. of Law in Opp'n to Defs.' Mot. Based on Allocation, Dkt. No. 260.)

In contrast, Pennsylvania rejects time on the risk allocation of an insured's losses. See J.H. France Refractories Co. v. Allstate Ins. Co., 534 Pa. 29, 39-40, 626 A.2d 502, 508 (1993); see also Koppers, 98 F.3d at 1450-51 (adopting the rejection of "time on the risk" allocation for environmental property damage cases).  Because there was no evidence tending to show that the insured's losses were incurred evenly across each successive policy period, Pennsylvania's Supreme Court refused "[t]o apportion liability among the insurers on a strictly temporal basis in direct proportion to the length of time each insurer was on the risk . . . ." J.H. France, 534 Pa. at 40, 626 A.2d at 508.  Afterwards, in Koppers, the Third Circuit considered the allocation of an insured's liabilities in light of pre-trial settlement agreements between the insured and its primary liability insurance providers.  98 F.3d at 1452.  As with the present case, the Koppers court had to "consider several complicating factors that were not present in J.H. France, namely, the presence of excess insurers, the insured's settlements with some primary and some excess insurers, and the district court's decision to limit the trial to a certain period of years at certain sites." Id.  Upon consideration of the "complicating factors," Koppers predicted "the Pennsylvania Supreme Court would hold that the non-settling excess insurers are jointly and severally liable for the full amount of the loss in excess of: the sum of (1) the policy limits of the directly underlying, 'exhausted' primary policies, and (2) the combined pro rata shares of other settling (primary and excess) insurers." Id. at 1455.

In view of Pennsylvania's rejection of the time on the risk method of allocation, there are relevant differences between the two states' laws.  Accordingly, there is an actual conflict of law, and both states' interests in having their laws applied must be considered in order to determine whether a true conflict exists.

### b.  True Conflict of Interests

There is a true conflict between two states' laws "if *both* jurisdictions' interests would be impaired by the application of the other's laws."  Hammersmith, 480 F.3d at 230 (emphasis in original) (citing Cipolla, 439 Pa. at 566, 267 A.2d at 856 (1970).  New York applies the time on the risk method of allocation for the very same reason Pennsylvania declines to do so, i.e., an insured's loss due to environmental property damage generally occurs over the span of several years or decades, thereby making it impossible to associate specific damages with individual policy periods.  Compare Consol. Edison, 98 N.Y.2d at 224, 746 N.Y.S.2d at 630 ("Yet collecting all the indemnity from a particular policy presupposes ability to pin an accident to a particular policy period."); with Koppers, 98 F.3d at 1450-51 ("As with asbestos-related bodily injury, environmental property damage is a progressive harm that, as a practical matter, is indivisible.");  J.H. France, 534 Pa. at 40 (warning courts not to assume "a linearity of disease progression").  New York's interest in allocating an insured's losses based upon the "time on the risk" stems from the practical difficulty of identifying when an environmental liability arose, whereas Pennsylvania courts consider it unfair to presume that an insured's losses occurred evenly across different policy periods. Therefore, given the two states' divergent rationales for their respective laws, a true conflict exists.

### c. **Weighing the States' Contacts**[5]

The first contact considered is the place of contracting.  "An insurance contract is made in the state where it is delivered."  Hammersmith, 480 F.3d at 233 (citing Harry L. Sheinman & Sons v. Scranton Life Ins. Co., 125 F.2d 442, 444 (3d Cir. 1941)).  As was previously decided, delivery of the 1968 policy was presumed to have been made at plaintiff's headquarters in Pennsylvania.  Crucible Materials Corp., 2000 WL 748104, at *5.  Much like when first considered in 2000, because there is no new evidence showing that plaintiff was headquartered in a different state at the time of contracting, this factor weighs in favor of applying Pennsylvania law.

The second factor is the place of negotiation of the contract.  Without discussing specifically how or through whom the contract was negotiated, plaintiff asserts that the parties' and insurance broker's respective locations reflect that negotiations took place within Pittsburgh, Pennsylvania; Montreal, Canada; and London, England.  In response, defendants only point to a single correspondence sent from the insurance broker in Montreal to plaintiff's new headquarters in New York *after* the 1968 policy was issued.  (See Ex. E to Grace Aff. in Supp. of Defs.' Mot. for Summ. J. Based on Allocation, Dkt. No. 256-1, 45.)  None of the parties have developed the record with respect to the location of negotiations *before* the contract was formed, and at most, there is a small degree of circumstantial evidence in

---

[5] The parties addressed the choice of law issue within their briefs for the summary judgment motion based on late notice. (See Defs.' Mem. of Law in Supp. of Mot. for Summ. J. Based on Late Notice, Dkt. No. 253; Pl.'s Mem. of Law in Opp'n to Defs.' Mot. for Summ. J. Based on Late Notice, Dkt. No. 261.) Defendants incorporated by reference their choice of law argument submitted in support of their late notice summary judgment motion into their motion based on allocation. (See Defs.' Mem. of Law in Supp. of Mot. for Summ. J. Based on Allocation, Dkt. No. 257, 3.)  Plaintiff was obviously put on notice that the choice of law issue pertained equally to the summary judgment motion based on allocation, and accordingly, plaintiff's choice of law argument submitted in its opposition to defendants' summary judgment motion based on late notice was also considered with respect to the summary judgment motion based on allocation.

support of plaintiff's position that negotiations occurred between Pennsylvania, Canada, and England.  Therefore, although the second contact favors the application of Pennsylvania law, this factor is afforded little qualitative weight in the overall choice of law analysis.

The third contact is the place of performance.  Under Pennsylvania law, the place of performance of an insurance contract is generally determined by where the premiums are paid.  Manor Care, Inc. v. Cont'l Ins. Co., No. 01-CV-2524, 2003 WL 22436225, at *7 (E.D. Pa. Oct. 27, 2003) (citing Cont'l Ins. Co. v. Beecham, Inc., 836 F. Supp. 1027, 1037-38 (D. N.J. 1993) (applying Pennsylvania's choice of law rules)).  However, none of the parties have argued as to the location of where premiums were paid.  The line slip upon which plaintiff relies to prove the material terms of the 1968 policy suggests that premiums of $16,000 were paid to the insurance broker in Montreal, Canada (see Ex. C to Grace Aff. in Supp. of Defs.' Mot. for Summ. J. Based on Allocation, Dkt. No. 256-1, 33), and there is no evidence to suggest that premium payments were delivered in either Pennsylvania or New York.  Previously, plaintiff's insurance contract with Travelers was deemed to have been principally performed in New York because "the plurality of sites for which plaintiff seeks insurance coverage are located within New York."  Crucible Materials Corp., 228 F. Supp. 2d at 189.  Similarly, with respect to defendants' policy, plaintiff concedes that seven of the eighteen sites covered by the 1968 policy are located in New York and none of the sites are located in Pennsylvania.  (Pl.'s Resp. to Defs.' Statement of Material Facts, Dkt. No. 261-2, ¶ 7.)  Therefore, in accordance with the earlier choice of law determination governing the Travelers policies, the place of performance of the 1968 policy favors application of New York law.

The fourth factor considered is the location of the subject matter of the contract.  Plaintiff cites Hammersmith in support of its position that this factor deserves little qualitative

weight because the subject sites are located within several different states.  In Hammersmith,

the insurer provided coverage for damage to the insured's subsidiaries "in more than twenty

states and throughout the world."  480 F.3d at 233.  The court found that the geographic

scope of the insured risk was similar to that of the risk insured in Compagnie des Bauxites de

Guinee v. Argonaut-Midwest Ins. Co., 880 F.2d 685 (3d Cir. 1989).  In Compagnie, the

location of the subject matter of the contract was afforded little significance because the

insurer agreed to provide insurance coverage for liabilities arising from the distribution of the

insured's manufactured goods.  Id. at 690.  Given the distribution of the insured's goods

*throughout the world*, the Compagnie court reasoned that "[t]he difficulty in defining, or even

locating, the insured risk and the lack of an understanding among the parties as to its

location combine to greatly diminish the importance of this factor."  Id.

Compared to the insured risks in Hammersmith and Compagnie, the 1968 policy

insures against risks that are located in a relatively modest eight different states, and seven

of the eighteen insured sites are located within New York, whereas none of the insured sites

are located within Pennsylvania.  Equally important is that the parties in Hammersmith and

Compagnie never had a common understanding as to the location of the insured risks

because the liabilities arose from the distribution of the insured's manufactured goods.  In

contrast, the 1968 policy insures against risks arising from environmental liabilities connected

with the use of real property, thereby making it much easier for the contracting parties to

arrive at a common understanding of the location of the insured risks at the time the contract

was formed.  Therefore, the location of the subject matter of the contract weighs in favor of

applying New York law rather than Pennsylvania law, particularly because none of the

insured sites are located within Pennsylvania.

The fifth and final contact is the domicile, residence, nationality, place of incorporation, and place of business of the parties.  The defendants are in large part irrelevant for purposes of this contact because they are British corporations.  For example, when confronted with plaintiff's allegation that their insurers were located in London, England, defendants merely stated that one of their insurers was located somewhere in the United States and that some of their other insurers may be located outside London.  (Defs.' Resp. to Pl.'s Statement of Material Facts, Dkt. No. 266-2, ¶ 43.)  In any event, defendants have never contended that they were incorporated or headquartered in either New York or Pennsylvania.  On the other hand, plaintiff's headquarters and place of business touch upon both of the states under consideration.  Plaintiff's current corporate entity, Crucible Materials Corporation, is the result of a series of mergers and acquisitions from October 1968 to December 1985.  (Pl.'s Resp. to Defs.' Statement of Material Facts, Dkt. No. 261-2, ¶¶ 1-6.)  The corporation to which the 1968 policy was issued, Crucible Steel Company of America, was succeeded by Crucible Steel Corporation.  (Ex. C to Grace Aff. in Supp. of Defs.' Mot. for Summ. J. Based on Allocation, Dkt. No. 256-1, 7).  The insured's corporate name was amended on the final page of the line slip for the 1968 policy to reflect Crucible Steel Corporation's status as the successor corporation.  (Id.)  Crucible Steel Corporation was among the many consolidated corporations included in the eventual formation of Crucible Materials Corporation.  It is undisputed that Crucible Steel Company of America was headquartered in Pennsylvania when the 1968 policy was issued.  (Defs.' Resp. to Pl's. Statement of Material Facts, Dkt. No. 266-2, ¶ 41.)  However, following the final merger in December 1985, Crucible Materials Corporation maintained its principle place of business in Syracuse, New York.  (Pl.'s Resp. to Defs.' Statement of Material Facts, Dkt. No. 261-2, ¶ 3.)

Additionally, plaintiff admits that it manages the environmental liabilities currently at issue from its Syracuse, New York headquarters.  (Id. at ¶ 6.)

Plaintiff's corporate history raises the question of whether to afford more weight to a party's place of business at the time of contracting, or alternatively, it's place of business at the time of performance.  Notably, plaintiff does not cite to any legal authority in support of its position that the place of business at the time of contracting controls.  (See Pl.'s Mem. of Law in Opp'n to Defs.' Mot. for Summ. J. Based on Late Notice, Dkt. No. 261, 14.)  Rather, plaintiff relies upon Pennsylvania's reasonable expectations doctrine discussed in Reliance Ins. Co. v. Moessner, 121 F.3d 895 (3d Cir. 1997) for the more general proposition that a contracting party's reasonable expectations should govern the terms of an insurance contract.  The issue in Moessner was whether the insured had a reasonable expectation of liability coverage for tort claims arising from the use of its manufactured products where (1) the original insurance policy would have covered product liability claims, (2) the insured requested coverage for product liability claims, and (3) the insured was never informed that the renewed insurance contract would contain an exclusionary clause barring indemnification for product liability claims.  Id. at 888.  The Moessner court reversed the district court's decision to grant summary judgment in favor of the insurer after concluding that there was, at a minimum, a triable issue of fact for whether the insured reasonably expected that the renewed insurance policy would cover claims arising from its manufactured products.  Id. at 906.

Under the same rationale, plaintiff now argues that because it was headquartered in Pennsylvania at the time of contracting, it reasonably expected that Pennsylvania law would apply.  However, plaintiff's reliance upon Moessner is misplaced because the holding

in that case rested upon the insurer's unilateral insertion of an exclusionary clause that was absent from the original insurance contract, as well as the insurer's failure to notify the insured of the newly added contract term.  Id. at 904, 906.  The holding in Moessner is therefore distinguishable because there is no evidence that the 1968 policy included a choice of law provision.  Rather than base its expectation upon prior negotiations with the defendants or the terms of a previously issued insurance policy, plaintiff believed Pennsylvania law would govern the terms of the 1968 policy because of the location of its headquarters.  Unlike Moessner, this is not a case where the insurers unilaterally deviated from the terms of a prior agreement.  Further, plaintiff moved its headquarters to Syracuse, New York in 1985 before notice of its insurance claim was provided, and plaintiff received correspondence with respect to the 1968 policy at its address in New York, New York as early as March 20, 1969.  (See Ex. E to Grace Aff. in Supp. of Defs.' Mot. for Summ. J. Based on Allocation, Dkt. No. 256-1, 45.)  In Hammersmith, the court acknowledged that "the significance of the parties' domiciles 'depends largely upon the issue involved and upon the extent to which they are grouped with other contacts.'" 480 F.3d at 235 (quoting RESTATEMENT (SECOND) OF CONFLICTS OF LAWS § 188 cmt. e (1971)).  As it relates to the allocation issue, plaintiff's current domicile within New York is significant because, as already noted, seven of the eighteen sites are located within New York and none are located within Pennsylvania.  Therefore, in light of plaintiff's unpersuasive reliance upon the reasonable expectations doctrine, as well as its failure to cite any legal authority holding that a party's domicile at the time of contracting controls, the fifth contact under the governmental interests analysis weighs in favor of applying New York law.

### d.  The Governmental Interests

Finally, each contact considered must be weighed on a "qualitative scale" to determine which state has a greater governmental interest in the application of its law to the particular issue presented.  See Hammersmith, 480 F.3d at 231 (quoting Shields, 810 F.2d at 400).  Although the places of contracting and negotiation favor the application of Pennsylvania law, these contacts are afforded little weight given their relation to the allocation of environmental liabilities at plaintiff's sites.  On the other hand, the place of performance, subject matter of the contract, and plaintiff's domicile favor the application of New York law and bear a much stronger connection to the allocation of plaintiff's environmental liabilities.  In particular, New York has a greater policy interest in the application of its allocation law because seven of the eighteen sites are located within New York.  Meanwhile, Pennsylvania's interest in allocating plaintiff's losses is diminished because none of the sites are located within the state.  Similarly, plaintiff has operated as a New York corporation for the overwhelming majority of the time since the 1968 policy was issued, including when it first provided notice of its insurance claims.  If indemnification payments were made, it is safe to presume that the payments would be issued to plaintiff's headquarters in New York and would be based upon the environmental liabilities incurred at plaintiff's various sites.  For all of these reasons, New York has a greater interest in the application of its allocation law to the 1968 policy than does Pennsylvania, and therefore, New York law will be applied.

### 2.  Plaintiff's Liabilities under New York Allocation Law

As previously discussed, New York allocation law pro-rates the total amount of an insured's losses based upon the length of time for which there was insurance coverage.  See

Consol. Edison Co., 98 N.Y.2d at 216, 225, 746 N.Y.S.2d at 624, 630.  In Consol. Edison

Co., "[t]he [trial] court took the highest projection of damages by Con Edison's expert ($51

million), divided by the number of years named in the complaint (50), and thus determined

that policies that attach at levels above $1.1 million were nonjusticiable because they would

not be reached even if Con Edison prevailed at trial."  Id. at 216, 746 N.Y.S.2d at 624.

Despite being put on notice that defendant's motion was based upon the

application of either New York or Pennsylvania allocation law, plaintiff forgoes any argument

for why it is entitled to excess liability coverage pursuant to the 1968 policy under the

application of New York law.  (See Pl.'s Mem. of Law in Opp'n to Defs.' Mot. Based on

Allocation, Dkt. No. 260, 3-10.)  Instead, plaintiff only addresses the application of

Pennsylvania allocation law.  (Id.)[6]  In any event, it is clear that plaintiff's losses do not trigger

the excess liability coverage provided in the 1968 policy under the application of New York's

allocation scheme.  Plaintiff's highest projection of its past and future losses are $12,941,567

and $200,006 for the Trent Tube and Pierce/York Oil sites, respectively.  (See Pl.'s Resp. to

Defs.' Statement of Material Facts, Dkt. No. 260-2, ¶¶ 14, 16.)  Although plaintiff reserved the

right to amend its projection of damages in the event additional losses were discovered, it

has not come forward with a new estimate of damages since originally responding to

defendants' interrogatories in October 1999.  Accordingly, it is presumed that plaintiff does

---

[6] As already noted, plaintiff argued for the application of Pennsylvania law within its brief in opposition to defendants' summary judgment motion based on late notice.  (See Pl.'s Mem. of Law in Opp'n to Defs.' Mot. for Summ. J. Based on Late Notice, Dkt. No. 261, 8-13; see also supra n.5.)  Plaintiff's argument within its brief in opposition to defendants' summary judgment motion based on allocation was limited to its reliance upon the law-of-the-case doctrine.  (See Pl.'s Mem. of Law in Opp'n to Defs.' Mot. for Summ. J. Based on Allocation, Dkt. No. 260, 2-3.)  However, reconsideration of the earlier decision to apply Pennsylvania law was warranted in light of the subsequent decisions in Budtel Assocs., 915 A.2d at 643-44, 645, n.6 and Hammersmith, 480 F.3d at 228-29, whereby the location of delivery of the contract was held to no longer be a controlling factor.

not have new evidence of additional losses at either of the remaining test sites, and the most recent projections of its losses must be considered with respect to defendants' summary judgment motion based on allocation.

Even under the most conservative interpretation of the time period identified in the complaint, plaintiff's environmental liabilities must be pro-rated across, at a minimum, the thirteen years during which there was insurance coverage.[7]  (See Pl.'s Third Am. Compl., Dkt. No. 248-5, ¶ 29.)  After dividing plaintiff's highest projection of damages by the number of years of insurance coverage, there are no issues of fact which, if true, would tend to prove that the damages at either of the remaining test sites would reach the $4 million attachment point of the 1968 policy.  Rather, the pro-rated damages for the Trent Tube and Pierce/York Oil sites are both under $1 million.  Significantly, plaintiff neglects to offer a contrary argument despite being put on notice that one of defendants' grounds for their summary judgment motion was the application of New York's allocation law.  Although it contends that any allocation of its environmental liabilities would be premature, plaintiff presently bears the obligation to respond to a summary judgment motion with "specific facts showing a genuine issue for trial."  FED. R. CIV. P. 56(e)(2).  Plaintiff's failure to come forward with such facts is accentuated by the time it has been given–more than a decade–to submit evidence showing that the losses at its environmental sites reach the attachment point of the 1968 policy under New York law.  Therefore, defendants' motion for summary judgment based upon the allocation of damages at those sites will be granted.

---

[7] It remains undetermined whether the time period for calculating the allocation of plaintiff's losses should be, as defendants maintain, greater than thirteen years because of the year in which operations at the test sites began.  However, even if the thirteen year period is applied, the final result is the same under the application of New York allocation law.

### D.  Late Notice

In light of the decision to grant defendants' summary judgment based upon allocation, the summary judgment motion based upon late notice is moot and will not be considered.

### E.  Plaintiff's Remaining Claim for Declaratory Judgment

Plaintiff argues that declaratory judgment is appropriate even if defendants are not presently obligated to make indemnification payments pursuant to the 1968 policy.  (Pl.'s Mem. of Law in Opp'n to Defs.' Mot. for Summ. J. Based on Allocation, Dkt. No. 260, 11.) Alternatively, plaintiff contends any dismissal of its claims should be without prejudice so that its lawsuit could be re-litigated "in the event that remediation costs exceed current estimates." (Id. n.4.)  However, as plaintiff concedes, declaratory relief pursuant to 28 U.S.C. § 2201 requires the existence of an "actual controversy."  At the very least, there is no actual controversy as to the Trent Tube and Pierce/York Oil test sites because, under New York allocation law, the liabilities at those sites do not trigger coverage under the 1968 policy. Plaintiff's speculation that remediation costs at those sites *may* eventually rise to the level needed to trigger excess liability coverage is insufficient to defeat defendants' summary judgment motion, especially in light of the more than adequate amount of time plaintiff was afforded to submit evidence of its losses at the remaining test sites.  Therefore, plaintiff's claim for declaratory relief for the Trent Tube and Pierce/York Oil sites will be dismissed with prejudice.  Resolution of the remaining claims related to the fourteen other sites will depend upon plaintiff being able to show that its losses at those sites reaches the attachment point for the 1968 policy as allocated under New York law.  If not, the complaint will have to be dismissed.

## IV.  CONCLUSION

It is evident that the choice of law issue is critical to defendants' summary judgment motion based on the allocation of plaintiff's liabilities.  The prior choice of law decision rendered in this case was reconsidered because that decision rested upon the belief that the place of delivery for the 1968 policy was a controlling factor.  Although, at the time that decision was made, some Pennsylvania courts attached greater significance to the place of delivery of a contract, subsequent cases made clear that Pennsylvania's choice of law rules favor consideration of the totality of a state's contacts with a contractual relationship, including, but not limited to, the state in which the contract was delivered.  After examining all of the contacts relevant to the choice of law analysis, New York has a greater interest in the application of its law governing the allocation of an insured's environmental liabilities.  Under New York's time on the risk method of allocation, summary judgment of plaintiff's claims for the Trent Tube and Pierce/York Oil test sites is warranted because there are no issues of fact which, if true, would prove that the environmental liabilities at those sites ever met the attachment point for the 1968 policy.

To deem this determination premature would be to ignore the amount of time plaintiff has been afforded to come forward with evidence of its remediation costs as well as plaintiff's obligation to set forth specific facts showing a genuine issue for trial in response to defendants' properly supported summary judgment motion.  Additionally, and perhaps because it properly evaluated the merits of such an argument, plaintiff does not discuss why it may recover damages for breach of the 1968 policy under the application of New York's allocation law.  Therefore, plaintiff's breach of contract claims for the Trent Tube and Pierce/York Oil test sites must be dismissed with prejudice.

Similarly, plaintiff's claim for declaratory relief must be dismissed due to the lack of an actual controversy.  Plaintiff cannot merely hope that it will discover new evidence of additional remediation costs during the interim period between now and the eve of trial.  Rather, plaintiff has been afforded more than a decade to come forward with evidence of its environmental liabilities at the test sites.  Therefore, plaintiff's declaratory judgment claim as to the Trent Tube and Pierce/York Oil test sites must also be dismissed with prejudice.

Accordingly, it is

ORDERED that

(1) defendants' summary judgment motion based on plaintiff's incorporation by reference theory (Dkt. No. 249) is DENIED;

(2) defendants' summary judgment motion based on allocation (Dkt. No. 257) is GRANTED;

(3) defendants' summary judgment motion based upon late notice (Dkt. No. 251) is DENIED as moot; and

(4) plaintiff's claims for declaratory judgment and breach of contract related to the Trent Tube and Pierce/York Oil sites are DISMISSED with prejudice.

IT IS SO ORDERED.

_____
United States District Judge

Dated: February 2, 2010
       Utica, New York